CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
03/27/2020
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) <br> INFORMATION ASSOCIATED WITH ) <br> **TWITTER USERNAME @STEPBROAJ** ) <br> **AT WWW.TWITTER.COM/STEPBROAJ** ) <br> WHICH IS STORED AT PREMISES ) <br> CONTROLLED BY TWITTER, INC. ) <br> ) | Case No.   3:20-mj-00009 <br><br> **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A WARRANT TO SEARCH AND SEIZE**

I, Robinson N. Blake, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Twitter account that is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., a social-networking company headquartered in San Francisco, CA ("Twitter"). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Twitter to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Twitter account.

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since March of 2009. I am currently assigned to the Richmond Division of the FBI, Charlottesville Resident Agency. I received formal training at the FBI Academy in Quantico,

1

Virginia, on, among other things, the United States Constitution and conducting criminal investigations, to include writing and executing search warrants. My principal duties include the investigation of various criminal violations, to include interstate threats. In the course of my career with the FBI, I have been involved in the execution of numerous federal search warrants, including those for social media platforms.

4. I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with the following account at Twitter: **@STEPBROAJ AT WWW.TWITTER.COM/STEPBROAJ,** further described in Attachment A. Based on the information below, I submit there is probable cause to believe the aforementioned Twitter account will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to 18 U.S.C. § 875(c) (Threats) and 18 U.S.C. § 2261A (Cyberstalking).

5. I base this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers assigned to this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, I have set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part.

**PROBABLE CAUSE**

6. Through training and experience, I am aware that individuals sending threatening communications will utilize cell phones and other electronic devices, electronic mail ("e-mail"), and social media to conduct their illegal activity.

7. In March 2020, the Charlottesville Police Department (CPD) opened an investigation into ongoing threats made against an identified victim ("VICTIM") by an individual using Twitter username @StepbroAJ. According to VICTIM, the user of the Twitter account @StepbroAJ is an individual named AGUSTIN LAINEZ, who also goes by the nickname "AJ" and who resides in Sanford, Florida. VICTIM believes LAINEZ to be twenty-one years of age.

8. Due to the possible location of the user of @StepbroAJ in Florida, the Federal Bureau of Investigation was asked to assist in the investigation of the threats made against VICTIM.

9. VICTIM first met the user of @StepbroAJ in an online gaming community on Twitch, which is a video live streaming service operated by Twitch Interactive, a subsidiary of Amazon. VICTIM and the user of @StepbroAJ became friends while playing against each other in on-line gaming. After playing, they would routinely engage in friendly conversation. VICTIM became aware that the user of @StepbroAJ liked it as more than a friend, however, VICTIM informed the user of @StepbroAJ that it did not feel the same way about him because it had not met him in person. To date, VICTIM has not met the user of @StepbroAJ in person.

10. One of the primary ways VICTIM and the user of @StepbroAJ communicated was through Twitter Direct Messages ("DM"). VICTIM used the Twitter username @brunettexbandit to when communicating with the user of @StepbroAJ. I am aware that Twitter DMs are a way for

users to engage in private communications with one another. According to VICTIM, in and around December 2019, the user of @StepbroAJ became possessive of VICTIM and began to send threatening and abusive messages.

11. In some of the messages, @StepbroAJ threatened physical harm against the VICTIM. For example, on January 6, 2020, the user of @StepbroAJ sent, in part, the following message to VICTIM: "…I should be good in like 3 months and if you haven't killed you self by than [sic] I'll unblock you so I can tell you which event to go to SO I CAN RAPE YOU…"

12. As another example, on February 21, 2020 at 8:00 PM, the user of @StepbroAJ sent the following message to VICTIM: "How dumb are you I really thought you would've sent it by now but you're just retarded and a COMPULSIVE LIAR you don't deserve any compassion I didn't do this until now because I really dumb you weren't that much of a clown and LIE AGAIN this is what I did just now and it's not even 5% of everything I have on you…" Following this message, the user of @StepbroAJ sent VICTIM a screenshot of a message he had composed, but not yet transmitted, to two additional Twitter users, in which the user of @StepbroAJ informs the users he had information regarding the VICTIM to share and requested that one of the users physically assault the VICTIM at a future date. VICTIM was physically located in or around Charlottesville, Virginia, when it received this message. Charlottesville, Virginia is located in the Western District of Virginia.

13. In other messages, @StepbroAJ threatened to publicly disclose personal information or nude photographs of the VICTIM if the VICTIM did not continue to communicate with him immediately or do as he instructed. Such disclosure would cause the VICTIM reputational harm and emotional distress. For example:

4

a. On January 6, 2020 at 1:38 PM, the user of @StepbroAJ sent, in part, the following message to VICTIM: "…any who go delete that post rn [right now] or ill expose you…but do it you have 10 minutes also I want to ruin your life as much as I can so I'm gonna go expose you to kameron and Karen and maybe leak your nudes and anything else I can think of thanks for fucking with me…"

b. On February 21, 2020 at 8:04 PM, the user of @StepbroAJ sent VICTIM a screenshot of a message he had composed but not yet transmitted. The message included VICTIM'S name, high school, city of residence, telephone number, and a list of people, according to the user of @StepbroAJ, that VICTIM had "shit talked/exposed behind their back." Along with the screenshot, the user of @StepbroAJ sent the message: "On my draft ready go go and I'm adding more…" VICTIM was physically located in or around Charlottesville, Virginia, when it received this message.

14. In other messages, @StepbroAJ demanded nude photographs or videos of the VICTIM as "payment" so that @StepbroAJ would not publicly disclose personal information about the VICTIM or publicly release the images he already possessed. For example,

a. On February 21, 2020, at 8:53 AM, the user of @StepbroAJ instructed the VICTIM to send him a video of VICTIM in the nude. The message read: "And save your fucking words and trying to switch things around I meant what I said and now you're actually pissing me off send the video last time I ask…"

b. On February 21, 2020, at 10:35 AM, the user of @StepbroAJ continued to pressure the VICTIM to send a video of VICTIM in the nude. The message read: "Ok it has to be today showing EVERYTHING at least a minute long after that we'll be back

      to normal and you don't have to stress about anything I'll drop everything I had in mind…"

c. On February 21, 2020, at 2:56 PM, the user of @StepbroAJ sent the victim the following messages: "Just send the video like you said you would I'll be waiting…"

d. Again, on February 21, 2020, at 3:03 PM, the user of @StepbroAJ sent VICTIM the following message: "Either you have until 9 pm or you know what happens or we go back to normal…"

e. VICTIM was physically located in or around Charlottesville, Virginia when it received the aforementioned messages on February 21, 2020.

15. In the messages, @StepbroAJ admits that he is extorting the VICTIM in order to force it to continue communicating with him or acceding to his demands. For example:

a. On February 23, 2020 at 3:17 PM, the user of @StepbroAJ instructed the victim to promise to never lie to the user or the user would expose personal information about VICTIM. The messages sent to the VICTIM are as follows: "That's the best deal you'll EVER get from me so if you want to never have to worry about getting blackmailed by me want to make things right with me/start over and he a decent human being with me for once in your life send me this message…"

b. On February 24, 2020, at 9:11 PM, the user of @StepbroAJ sent, in part, the following message to VICTIM: "…I Just wish I didn't have to literally blackmail you for you to tell me the truth and not be a whore lol…"

c. VICTIM was physically located in or around Charlottesville, Virginia when it received the aforementioned messages on February 23 and February 24, 2020.

16. Over time, the messages have escalated in intensity and directness. On March 16, 2020, at 6:44 PM, the user of @StepbroAJ sent, in part, the following message to VICTIM: "IF YOU BREAK MY PROMISE/HAVE BROKEN IT NOT ONLY WILL I DO EVERYTHING IVE SAID AND MAKE YOUR LIVE UNLIVABLE BUT I WILL…FUCKING HURT YOU NOW and I'm not talking mentally anymore but PHYSICALLY…"

17. Out of fear, the VICTIM continues to communicate with @StepbroAJ, who demands communications and responses on a virtually daily basis. In response to some of these threats, the VICTIM sent the user of @StepbroAJ a video of VICTIM in the nude. VICTIM would not have sent the video had the user of @StepbroAJ not threatened to expose personal information about VICTIM.

18. Due to the threats received from the user of @StepbroAJ, the VICTIM is in fear for VICTIM's safety. Additionally, the threats have caused substantial emotional distress to the VICTIM, some of which has physically manifested itself. On at least one occasion, the VICTM has experienced a panic attack as a result of the messages from the user of @StepbroAJ.

19. According to VICTIM, the user of @StepbroAJ also created Twitter account with username @gamercommunitea for the purpose of posting information about VICTIM. VICTIM told me that the user of @StepbroAJ made this account private, meaning it cannot currently be seen by other Twitter users. The user of @StepbroAJ has threatened to make this account public and post personal information about the VICTIM if it does not do what he tells it, to include having sexual intercourse with him at a later date.

20. On March 23, 2020, the FBI submitted a preservation request letters using Twitter's Law Enforcement portal requesting that Twitter preserve records for any accounts using the name

7

@SteprboAJ. On the same day, I received an e-mail from Twitter acknowledging the request was received and Twitter had taken steps to preserve the requested information.

21. On March 23, 2020, the FBI submitted a preservation request letters using Twitter's Law Enforcement portal requesting that Twitter preserve records for any accounts using the names @SteprboAJ and @gamercommunitea. On the same day, I received e-mails from Twitter acknowledging the requests were received and Twitter had taken steps to preserve the requested information.

22. Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

23. Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

24. Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that

connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

25. A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

26. Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

27. As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

28. Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

29. Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

30. When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

31. A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

32. In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

33. Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

34. Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

35. Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

36. If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

37. In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

38. As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets"

(status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Twitter to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

42. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Twitter who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Robinson N. Blake*
Robinson N. Blake
Special Agent - FBI

Received by reliable electronic means and sworn and attested to by telephone on this 27th day of March 2020.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE